UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:17-cv-22281-MGC

HERALDS OF THE GOSPEL
FOUNDATION, INC.,
a Florida corporation; and
ASSOCIAÇÃO ARAUTOS DO
EVANGELHO DO BRASIL, a foreign entity,

       Plaintiffs,

vs.

ALFONSO BECCAR VARELA,
an individual; and
DOES 1 through 2, inclusive,

       Defendants.

_____/

**PLAINTIFFS' *EMERGENCY* MOTION FOR *EX PARTE***
**TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE REGARDING**
**PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW**

Plaintiffs HERALDS OF THE GOSPEL FOUNDATION, INC. (the "Heralds") and

ASSOCIAÇÃO ARAUTOS DO EVANGELHO DO BRASIL (the "Association") (collectively,

the "Plaintiffs"), by undersigned counsel and pursuant to Fed. R. Civ. P. 65 and S.D. Fla. L.R.

7.1, hereby move on an *ex parte* basis for a temporary restraining order and order to show cause

why a preliminary injunction should not issue against Defendants Alfonso Beccar Varela

("Varela") and DOES 1 through 2, inclusive (the "DOE Defendants"), and in support thereof,

Plaintiffs respectfully direct the Court to the following Memorandum of Law.  A Certificate of

Emergency is attached hereto as **Exhibit A** in accordance with S.D. Fla. L.R. 7.1(d).

<u>TABLE OF CONTENTS</u>

<u>Page No.</u>

I.      NATURE OF THE EMERGENCY AND INTRODUCTION ............................................1

II.     STATEMENT OF FACTS .................................................................................................2

        A.      Background of the Association and Heralds ...........................................................2

        B.      The Copyrighted and Misappropriated Videos At Issue........................................3

        C.      The Defendants' Illicit Conduct.............................................................................6

III.    ARGUMENT .....................................................................................................................8

        A.      Standards For Issuing A Preliminary Injunction/Temporary Restraining
                Order......................................................................................................................8

        B.      Plaintiffs Have A Substantial Likelihood of Prevailing On The Merits................9

                1.      The Association has a substantial likelihood of prevailing on the
                        Merits of its copyright infringement claim..................................................9

                2.      The Plaintiffs have a substantial likelihood of prevailing on their
                        federal and state trade secret misappropriation claims.............................11

        C.      Plaintiffs Will Suffer Irreparable Harm Without An Injunction..........................15

        D.      Balance Of Hardships: The Injury To Plaintiffs Outweighs Any Damage to
                Defendants ...........................................................................................................15

        E.      A Preliminary Injunction Will Serve The Public Interest....................................16

        F.      The Equitable Relief Sought Is Appropriate, Including Temporary Seizure
                Of Varela's Hard Drive .......................................................................................17

        G.      A Minimal Bond Should Secure the Injunction ..................................................18

IV.     CONCLUSION ................................................................................................................18

<u>TABLE OF AUTHORITIES</u>

<u>Page No(s).</u>

*All Care Nursing Serv., Inc. v. Bethesda Mem. Hosp., Inc.*,
887 F.2d 1535, 1537 (11th Cir. 1989) ........................................................................ 8

*Cable/Home Communication Corp. v. Network Productions, Inc.*,
902 F.2d 829, 846 (11th Cir. 1990) ........................................................................ 11

*C.B. Fleet Co., Inc. v. Unico Holdings, Inc.*,
510 F. Supp. 2d 1078, 1080-81 (S.D. Fla. 2007) ...................................................... 9

*Childers v. High Society Magazine, Inc.*,
557 F. Supp. 978, 983 (S.D.N.Y. 1983) .................................................................... 9

*Cipes v. Mikasa, Inc.*,
346 F. Supp. 2d 371, 374-75 (D. Mass. 2004) .......................................................... 9

*Commodores Entm't Corp. v. McClary*, No. 6:14-cv-1335-Orl-37GJK,
2014 WL 5285980, at *2 (M.D. Fla. Oct. 15, 2014) ................................................. 8

*Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*,
136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) .......................................................... 11

*East v. Aqua Gaming, Inc.*,
805 So. 2d 932, 934 (Fla. 2d DCA 2001) ................................................................ 16

*Fortline, Inc. v. Moody*, 12-CV-81271,
2013 WL 12101142, at *5 (S.D. Fla. Jan. 7, 2013) ........................................... 15, 16

*Golan v. Holder*,
609 F.3d 1076, 1080 (10th Cir. 2011) ...................................................................... 9

*Granny Goose Funds, Inc. v. Brotherhood of Teamsters and Auto Truck
Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 439 (1974) ..................... 17

*Herzog v. Castle Rock Entm't*,
193 F.3d 1241, 1247-48 (11th Cir. 1999) ............................................................... 10

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
886 F. Supp. 2d 1120, 1125-26 (S.D.N.Y. 1995) ................................................. 9, 10

*Kuklachev v. Gelfman*,
600 F. Supp. 2d 437, 474 (E.D.N.Y. 2009) ............................................................. 10

TABLE OF AUTHORITIES
(continued)

Page No(s).

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
  51 F.3d 982, 985 (11th Cir. 1995) ............................................................................. 8

*McDonald's Corp. v. Robertson*,
  147 F.3d 1301, 1306 (11th Cir. 1998) ....................................................................... 8

*Northeastern Florida Chapter v. City of Jacksonville*,
  896 F.2d 1283, 1285 (11th Cir. 1990) ..................................................................... 15

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Serv., Inc.*,
  923 F. Supp. 1231, 1252 (N.D. Cal. 1995) ......................................................... 12, 13

*Roig v. Star Lofts on the Bay Condominium Ass'n, Inc.*, No. 11-20421-Civ,
  2011 WL 6178882, at *2 (S.D. Fla. Dec. 12, 2011) ................................................ 10

*Schiavo ex rel. Schindler v. Schiavo*,
  403 F.3d 1223, 1225–26 (11th Cir. 2005) .................................................................. 8

*SmokEnders, Inc. v. Smoke No More, Inc.*,
  184 U.S.P.Q. 309 (S.D. Fla. 1974) ........................................................................... 12

*Stoneworks Inc. v. Empire Marble and Granite Inc.*,
  49 U.S.P.Q.2d 1760, 1765–66 (S.D. Fla. 1998) ...................................................... 17

*Suzuki Motor Corp. v. Jiujiang Hison Motor Boat Mfg. Co., Ltd.*,
  No. 1:12-cv-20626, 2012 WL 640700, at *5 (S.D. Fla. Feb. 27, 2012) ................... 16

*VAS Aero Svs., LLC v. Arroyo*,
  860 F. Supp. 2d 1349, 1359 (S.D. Fla. 2012) .......................................................... 14

*Zito v. Steeplechase Films, Inc.*,
  267 F. Supp. 2d 1022, 1026 (N.D. Cal. 2003) ........................................................... 9

OTHER AUTHORITIES

17 U.S.C. § 101 ............................................................................................................. 10

17 U.S.C. § 411 ............................................................................................................. 10

17 U.S.C. § 502(a) .......................................................................................................... 9

18 U.S.C. § 1836(b)(3)(A)(i) ......................................................................................... 11

<u>TABLE OF AUTHORITIES</u>
(continued)

<u>Page No(s).</u>

18 U.S.C. § 1839(3) ................................................................................................ 12

18 U.S.C. § 1839(5) ................................................................................................ 12

18 U.S.C. § 1839(6) ................................................................................................ 12

Fed. R. Civ. P. 65 ................................................................................................... 17

Fed. R. Civ. P. 65(b)(1)(A) ...................................................................................... 8

Fed. R. Civ. P. 65(b)(1)(B) .................................................................................... 19

Fed. R. Civ. P. 65(c) .............................................................................................. 18

Fla. Stat. § 688.001 ............................................................................................... 16

Fla. Stat. § 688.002(1) ........................................................................................... 12

Fla. Stat. § 688.002(2) ........................................................................................... 12

Fla. Stat. § 688.002(4) ........................................................................................... 12

Fla. Stat. § 688.003(1) ........................................................................................... 11

2 Eckstrom's Licensing: Joint Ventures § 9:136 .................................................... 9

58 J. Copyright Soc'y U.S.A. 243, 253 (2011) ..................................................... 10

**MEMORANDUM OF LAW**

**I.     NATURE OF THE EMERGENCY AND INTRODUCTION**

Defendant Varela has illegally acquired confidentially maintained videos and images relating to Plaintiffs' research, development, and performance of healing prayers and healing rituals that are administered, and intended to be administered, in private settings.  Varela has acquired these copyright-protected videos with the assistance of one or more DOE Defendants that were in possession of these videos and images, and contractually obligated to maintain the confidentiality of these videos and images.

In a calculated and relentless attempt to damage the Plaintiffs' goodwill and reputation for his own financial gain, Varela has repeatedly attempted to disclose these videos and images to the public, including but not limited to, posting and commenting on the subject videos and images through various video-sharing websites as well as Varela's own websites, https://tfpheraldos.blogspot.com (also referred to herein as the "blogspot.com" sites), and more recently, https://inperterritus.com.

 Plaintiffs have diligently provided "take-down" notices to these various video-sharing websites in accordance with the Digital Millennium Copyright Act ("DMCA").  However, without an order from this Court immediately enjoining Varela's conduct, these illicitly obtained videos and images will once again be—and are presently being— made available to the public.

The Defendants' unauthorized possession and distribution of these videos and images is directly causing immediate and irreparable harm to the Plaintiffs, including but not limited to the negative impact the Defendants' conduct is having on Plaintiffs' relationship with the Vatican as well as with thousands of charitable donors throughout the world, many of whom reside in this judicial district.

Furthermore, as demonstrated by Varela's own blog entries, Varela is actively seeking the assistance of third parties throughout the world to assist him in disseminating the Plaintiffs' illegally obtained property.  Indeed, by his own admission, Varela is notifying the public that he is in possession of the "original" videos that were illegally obtained with the assistance of the DOE Defendants, and has also admitted that he is in possession of fifty (50) additional videos that he is attempting to post on his blogspot.com site.  Only an extraordinary remedy will stop Varela.  Therefore, in addition to seeking immediate injunctive relief, Plaintiffs are also requesting that this Court instruct Varela to submit to the U.S. Marshalls Service the personal laptop or other computer hard drive he used to store and disseminate Plaintiffs' videos.  This request is made for the limited purpose of permitting Plaintiffs' undersigned counsel to take an image of, and thus preserve, said hard drive as well as to prevent Varela from the further dissemination and misappropriation of the videos and images at issue (or any additional confidential videos he may have in his possession).

In sum, without the immediate entry of a Court order precluding Varela and the DOE Defendants from continuing with their pattern of illicit conduct, Plaintiffs will suffer irreparable injury which cannot be remedied as a matter of law.

## II.   STATEMENT OF FACTS

### A.   Background of the Association and Heralds

The Association, (or "Arautos do Evangelho" which translates to "The Heralds of the Gospel"), is an International Association of Pontifical Right based in Brazil, and is the first to be approved by the Vatican in this millennium.  *See* accompanying Declaration of Father Marcos Faes Araujo ("Araujo Decl.") at ¶4.  The Association is present in 78 countries.  Araujo Decl. at ¶5.  Some of its members practice celibacy, living in houses destined specifically for individuals

that study, pray, and conduct evangelizing activities in dioceses and parishes (hereinafter, "Houses").  *Id*.  Members of the Association are devoted to a life of charity in their communities, aiding and fostering unity between practical life and faith.  *Id*.

In the United States, Houses only exist in Miami, Florida and in Katy (Greater Houston Area), Texas.  Members of the community in Miami and the Greater Houston areas are familiar with the charitable work of the Plaintiffs, or at least such charitable work is better known in these regions than in the rest of the United States.  Araujo Decl. at ¶6.

The Heralds, based in Miami, Florida, is the only entity in the United States which is directly affiliated with the Association.  Araujo Decl. at ¶7.  The Heralds was established in Florida in 2003.  *Id*.  There are three categories of members of the Heralds: priests, nuns, and families.  *Id*.  About thirty (30) families in the State of Florida are members of the Heralds, all of which reside in this judicial district.  *Id*.

The various communities of the members of the Heralds, including priests, carry out their ministry and their mission to offer charitable and volunteer work to the community in South Florida and to the world at large through its civil entity, Mary Queen of the Third Millennium ("Mary Queen").  Araujo Decl. at ¶8.  Mary Queen also has active members throughout the South Florida community.  Araujo Decl. at ¶9.  Both the Heralds and its civil entity Mary Queen receive donations which are used to fund their work in the community.  *Id*.  Since its formation, Mary Queen has counted with the support of thousands of donors in the State of Florida alone. *Id*.

**B.     The Copyrighted and Misappropriated Videos at Issue**

The Association created nine audio visual works which are the subject of the copyright claim asserted in this Complaint (the "Videos").  *See* accompanying Declaration of Father

Antonio Guerra de Oliveira, Jr. ("Guerra Decl.") at ¶2; *see also* accompanying Declaration of Father Rodrigo Solera Lacayo ("Lacayo Decl.") at ¶2.  The copyrights for the Videos have been properly assigned to the Association.  *See* accompanying Declaration of Father Jonas Venero Sananes ("Sananes Decl.") at ¶¶3-7; accompanying Declaration of Thiago Tamura Nogueira ("Nogueira Decl.") at ¶¶3-6; and accompanying Declaration of Julius Santana ("Santana Decl.") at ¶¶2-3.  The assignments of copyright properly identify the copyrighted works embodied by the Videos.  *Id.*

Five of these Videos show private, confidential meetings and discussions among an international committee of priests that are members of the Association (the "Committee Meetings").  Guerra Decl. at ¶3; Sananes Decl. at ¶2.  These five Videos were recorded in 2016, in a private setting, and with no members of the public being present.  Guerra Decl. at ¶3; Sananes Decl. at ¶¶3-7.

During these Committee Meetings, the participants were asked to share their observations and experiences with extraordinary cases of spiritual or possible mental illnesses, and through these discussions and caucuses (the "Confidential Discussions"), assist in the compilation of information and development of a unique protocol for treating these cases, in part, by using healing prayers and/or healing rituals. (the "Private Rituals").  Guerra Decl. at ¶4; Sananes Decl. at ¶2.  The Association has dedicated significant amounts of time, effort, and financial resources towards coordinating these Committee Meetings.  Guerra Decl. at ¶5.  The goal of these Committee Meetings and Confidential Discussions was to 1) better inform the members of the Association about these extraordinary cases; 2) assist the Association towards contributing to the spiritual well-being of persons seeking help and guidance from the Association; and 3) improve

the efficiency of the services that the Association provides to the Catholic Church.  Guerra Decl. at ¶6.

Four of these Videos depict priests that are members of the Association performing the Private Rituals on other members of the Association afflicted with the types of conditions discussed and studied during the Committee Meetings.  Guerra Decl. at ¶8; Nogueira Decl. at ¶2. These four videos were recorded in Brazil in a chapel that was closed to the public and with a very limited number of members of the Association being present.  Guerra Decl. at ¶8; Nogueira Decl. at ¶¶3-6.

In some Houses worldwide (including the Heralds, located in this judicial district), access to the Videos was given to select persons who were provided with a password to access a private website with the uploaded Videos.  Lacayo Decl. at ¶5.  Those persons that were provided with access to the private website were also required to sign a non-disclosure and confidentiality agreement ("NDA") with the Association.  Lacayo Decl. at ¶6.  Only persons having access to the digital files were required to sign the NDA's.  Lacayo Decl. at ¶7.  The digital files were sent to these individuals with PGP encryption having specific personal passwords provided for each individual given access to the digital files.  *Id*.

An individual with access to the digital files was only permitted to show the Videos to selected members of the Association residing in the individual's House, all of whom are under a general obligation of secrecy regarding activities within the House.  *Id*.  The Videos were not intended to be made public or copied by others.  Guerra Decl. at ¶13; Lacayo Decl. at ¶12.  Any such public disclosure or copying of the Videos would require the approval of the Association's founder, Msgr. João Scognamiglio Clá Dias.  *Id*.

### C.      The Defendants' Illicit Conduct

Beginning in May 2017, all nine of the Videos were illicitly leaked on the Internet by Varela through his website https://tfpheraldos.blogspot.com.  Guerra Decl. at ¶9; Lacayo Decl. at ¶8; Sananes Decl. at ¶¶3-7; Nogueira Decl. at ¶¶3-6.  The Videos were also made available through YouTube, Vimeo, Rutube, and vk.com.  *Id.*

Through his blogspot.com site, Varela admits that he has received from various persons within the Association videos describing the "beliefs and secret activities" of the Association: ""As I have informed, *Heraldos del Evangelio [Heralds of the Gospel] is doing all it can to remove the videos with sensitive content that several people from the institution have sent me to alert the public and The Holy See regarding the beliefs and secret activities of this cult that has become deeply embedded in the Catholic Church*."  *See* accompanying Declaration of Rafael Perez-Pineiro ("Perez Decl.") at ¶3 (emphasis added).

Plaintiffs have attempted to remove these Videos by submitting take-down notices in accordance with the Digital Millennium Copyright Act ("DMCA").  Guerra Decl. at ¶10; Lacayo Decl. at ¶9.  Despite Plaintiffs' efforts, Varela has submitted counter-notices to the sites that were hosting the Videos.  Guerra Decl. at ¶11; Lacayo Decl. at ¶10.  Thus, pursuant to the DMCA, the Videos could be uploaded again by these hosting websites unless this Court enjoins the reproduction and display of the Videos.  As early as June 14, 2017, Vimeo has restored an offending Video and informed Plaintiffs that it will not remove the Video unless it receives a court order instructing its removal.  Lacayo Dec. at ¶10; Guerra Decl. at ¶12.

Varela's efforts to harm Plaintiffs and unlawfully provide access to the private videos extend beyond U.S. borders.  Acknowledging in his blog that Plaintiffs' efforts to take down the Videos have been somewhat successful within the United States, Defendant Varela is now

posting links to the Videos hosted in foreign websites on his blog, and continues to search for websites to post the infringing Videos.  Perez Decl. at ¶4.  Not stopping there, Varela is presently offering to e-mail the videos to individuals that would like to obtain an illegal copy of the Videos with the goal of having others upload the infringing videos illegally on different sites: "***We need volunteers that can upload these videos to different Internet accounts and sites. If you want to help me, contact me at [mailto:abeccar@gmail.com] and I will forward you copies for you to distribute***."  Perez Decl. at ¶5 (emphasis added).  In continuing to incite others to unlawfully distribute Plaintiffs' copyrighted and confidential Videos, Varela has also further admitted that he is still in possession of "original" Videos.  Perez Decl. at ¶6.  Varela has also recently admitted that he is in possession of fifty (50) additional videos that he intends on posting on his websites.  Perez Decl. at ¶10.

Varela's seemingly ideologically-driven motivation, however, is belied by the fact that approximately two years ago Varela demanded $50,000.00 from the Association in exchange for taking down his blog and refraining from starting a new blog.  Perez Decl. at ¶7.  It is therefore evident that Varela's motivation is purely financial.  Further proof that Varela is only seeking to profit from his illicit behavior can be found in yet another one of his recent posts wherein Varela is seeking donations in a purported effort to add capacity to his site in order to post more illicitly obtained videos.  Perez Decl. at ¶8.  Varela was spending 5.50 euros per month for his site; however, in order to double his site's capacity, Valera would only need to spend an additional 4.40 euros per month, or a mere 19.40 euros for a plan having the highest capacity.  Perez Decl. at ¶9.  Thus, Varela would undoubtedly profit personally from any donations received from this request, and more significantly, profit from the dissemination of the Plaintiffs' confidential Videos.

## III.   ARGUMENT

This Court should grant Plaintiffs' motion for preliminary injunction and temporary restraining order and enjoin the Defendants' use and dissemination of Plaintiffs' copyright protected Videos and Trade Secret Information.

### A.   Standards For Issuing A Preliminary Injunction/Temporary Restraining Order

A plaintiff seeking injunctive relief must establish: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998), citing *All Care Nursing Serv., Inc. v. Bethesda Mem. Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989).  "However, the Court does not have to find that 'evidence positively guarantees a final verdict in plaintiff's favor.'"  *Commodores Entm't Corp. v. McClary*, No. 6:14-cv-1335-Orl-37GJK, 2014 WL 5285980, at *2 (M.D. Fla. Oct. 15, 2014) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)).

A request for an *ex parte* Temporary Restraining Order (TRO) is evaluated by the same factors that generally apply to a preliminary injunction.  *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005).  A TRO may be granted upon a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."  Fed. R. Civ. P. 65(b)(1)(A).

**B.      Plaintiffs Have A Substantial Likelihood Of Prevailing On The Merits**

     1.      **The Association has a substantial likelihood of prevailing on the merits of its copyright infringement claim**

Under the U.S. Copyright Act, a district court has the power to grant temporary and final injunctions on such terms as the court may deem reasonable to prevent or restrain infringement of a copyright.  17 U.S.C. § 502(a); *C.B. Fleet Co., Inc. v. Unico Holdings, Inc.,* 510 F. Supp. 2d 1078, 1080-81 (S.D. Fla. 2007).

The Berne Convention for the Protection of Literary and Artistic Works of 1886 (the "Berne Convention") requires each signatory country to recognize copyrighted works of authors from other signatory countries in the same way it would recognize the copyrighted works of its nationals.  *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 886 F. Supp. 2d 1120, 1125-26 (S.D.N.Y. 1995) ("The Berne Convention provides that works copyrighted in signatory foreign countries and written by nationals of those countries or the United States are to be given copyright protection under United States law if first published in a nation adhering to the convention.").[1]   Brazil became a signatory member of the Berne Convention on February 9, 1922. 2 Eckstrom's Licensing: Joint Ventures § 9:136 (April 2017).  The United States became a signatory member of the Berne Convention in 1989.  *Golan v. Holder*, 609 F.3d 1076, 1080

---

[1] The location of first publication is not an issue here because the Videos at issue were never published.  *See, e.g., Cipes v. Mikasa, Inc.,* 346 F. Supp. 2d 371, 374-75 (D. Mass. 2004) ("an unauthorized user of a work is incapable of publishing it within the meaning of the Copyright Act"); *Zito v. Steeplechase Films, Inc.,* 267 F. Supp. 2d 1022, 1026 (N.D. Cal. 2003) (citing cases in other Circuits where an unauthorized "publication" did not turn an unpublished work into a published one for purposes of the Copyright Act); *Childers v. High Society Magazine, Inc.,* 557 F. Supp. 978, 983 (S.D.N.Y. 1983) (holding that unauthorized publication does not count towards making a work published under the law and noting that the "United States Register of Copyrights provides in its instructions that works whose only publication was unauthorized are to be labeled 'unpublished' on the registration certificate").

(10th Cir. 2011).  It is also well-known that Spain was one of the first signatories to the Berne

Convention.  58 J. Copyright Soc'y U.S.A. 243, 253 (2011).

Pursuant to the accompanying Declarations of Fr. Sananes and Mssrs. Noguiera and

Santana, the Videos were copyrighted in Brazil—a signatory to the Berne Convention—by

nationals of Berne Convention signatories (*i.e.* Brazil and Spain).  Therefore, the Videos are

Berne Convention works as defined in the Copyright Act of 1976, Title 17 U.S.C. §§ 101, *et*

*seq.*, and are therefore subject to the protections of the Copyright Act.  *See Itar-Tass Russian*

*News Agency*, 886 F. Supp. 2d at 1125-26 (finding substantial likelihood that works first

published in U.S. or Russia after March 1995, whose authors were Russian nationals, "are Berne

Convention works under 17 U.S.C. § 101").  Foreign works that qualify as Berne Convention

works are not subject to the copyright registration requirement of 17 U.S.C. § 411 before filing

an infringement suit.  *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 474 (E.D.N.Y. 2009).

A claim for copyright infringement consists of only two elements: 1) a plaintiff must

show that the plaintiff owns a valid copyright; and 2) that the defendant has engaged in

unauthorized copying.  *Roig v. Star Lofts on the Bay Condominium Ass'n, Inc.*, No. 11-20421-

Civ, 2011 WL 6178882, at *2 (S.D. Fla. Dec. 12, 2011), citing *Herzog v. Castle Rock Entm't*,

193 F.3d 1241, 1247-48 (11th Cir. 1999).  The copying must be so extensive that there is a

substantial similarity between the defendant's work and the protectible elements of the plaintiff's

work.  *Itar-Tass Russian News Agency*, at 1124.

Here, the Declarations Fr. Sananes and Mssrs. Noguiera and Santana, all demonstrate that

ownership in the copyrights to the Videos has been properly assigned to the Association.

Sananes Decl. at ¶¶3-7; Nogueira Decl. at ¶¶3-6; Santana Decl. at ¶¶2-3.  With respect to the

second element of a copyright claim, pursuant to accompanying declarations, as well as by

Varela's own admission, Varela has engaged in the reproduction of the Videos without authorization from the Association.  Sananes Decl. at ¶¶3-7; Nogueira Decl. at ¶¶3-6; Guerra Decl. at ¶9; Lacayo Decl. at ¶¶8, 12; Perez Decl. at ¶¶3-6.  Moreover, because Varela admittedly acquired the Videos from the DOE Defendants, *see* Perez Decl. at ¶3, the DOE Defendants are also likely liable as contributory infringers.  *See Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 846 (11th Cir. 1990) ("The Supreme Court has defined a contributory infringer as one who 'was in a position to control the use of copyrighted works by others and had authorized the use without permission from the copyright owner.'").

Furthermore, there is no requirement for this Court to determine whether Varela's works are "substantially similar" to Plaintiffs' Videos, because Varela posted exact copies of the Videos.  Sananes Decl. at ¶¶3-7; Nogueira Decl. at ¶¶3-6.  Defendants' actions therefore constitute copyright infringement and the Association is likely to succeed on the merits of its copyright claim.

### 2.      Plaintiffs have a substantial likelihood of prevailing on the merits of their federal and state misappropriation of trade secrets claims

Both the federal Defend Trade Secrets Act (DTSA) and Florida's Uniform Trade Secrets Act (FUTSA) authorize a court to grant an injunction to prevent "actual" or "threatened" misappropriation of a "trade secret."  18 U.S.C. § 1836(b)(3)(A)(i); Fla. Stat. § 688.003(1).  To prevail on their claim for misappropriation of trade secret, Plaintiffs must demonstrate (1) that Plaintiffs possessed a trade secret; and (2) that Plaintiffs' trade secret information was "misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it."  *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.,* 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001).

Under the DTSA and FUTSA, a "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including designs, prototypes, methods, techniques, processes, or procedures … if: (A) the owner has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  18 U.S.C. § 1839(3); Fla. Stat. § 688.002(4).

Most relevant to this case, the DTSA and FUTSA both define "misappropriation" as the acquisition of a trade secret of another by a person without consent and by improper means.  *See* 18 U.S.C. § 1839(5); Fla. Stat. § 688.002(2).  Both the DTSA and FUTSA define "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  *See* 18 U.S.C. § 1839(6); Fla. Stat. § 688.002(1).

Here, the Private Rituals discussed during the Committee Meetings and privately administered to members of the Association were compiled from multiple international sources to develop a methodology for treating extreme cases of spiritual and/or possible mental illness (Plaintiffs' "Trade Secret Information").  Guerra Decl. at ¶¶3, 4, & 8; Sananes Decl. at ¶2; and Nogueira Decl. at ¶2.  This information falls squarely within the DTSA's and FUTSA's definition of trade secrets.  Indeed, information that was compiled as an integral part of the Plaintiffs' spiritual counseling is not fundamentally different from the information that this Court upheld as a trade secret in *SmokEnders, Inc. v. Smoke No More, Inc.*, 184 U.S.P.Q. 309 (S.D. Fla. 1974).  *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Serv., Inc.*, 923 F. Supp. 1231, 1252 (N.D. Cal. 1995) ("This case is analogous to *SmokEnders* because in both cases the

'commodity' that is produced from the trade secrets is the result achieved by the person using the course materials and their techniques (whether it be stopping smoking or reaching a 'higher spiritual existence').").

Furthermore, in *Religious Technology Center*, the district court found that information related to the operation of a religious entity may qualify as trade secret protection:

> Conversely, there is no authority for excluding religious materials from trade secret protection because of their nature.  Indeed, there is no authority for excluding any type of information because of its nature.  ***While the trade secret laws did not necessarily develop to allow a religion to protect a monopoly in its religious practices, the laws have nonetheless expanded such that the Church's techniques, which clearly are "used in the operation of the enterprise," Restatement § 39, at 425, are deserving of protection if secret and valuable.***

*Id*. (emphasis added).[2]  Here, Plaintiffs' Trade Secret Information, 1) better informs the members of the Association about extraordinary cases of spiritual and/or mental illness; 2) assists the Association towards contributing to the spiritual well-being of persons seeking help and guidance from the Association; and 3) improves the efficiency of the services that the Association provides to the Catholic Church.  Guerra Decl. at ¶6.  Accordingly, the Plaintiffs' Trade Secret Information is "used in the operation of [Plaintiffs'] enterprise."

Plaintiffs have also taken more than reasonable measures towards safeguarding the confidentiality of their Trade Secret Information, including but not limited to, requiring the recipients of digital files containing the Videos to execute NDA's, restricting access to these

---

[2] In *Religious Technology Center*, the asserted works included published works as well as confidentially maintained works.  *Id*. at 1239.  The district court held that, because the plaintiff claimed that "the entire works themselves" comprised the trade secret, it would be impossible to determine when the secret is lost when portions of the work are disclosed.  Thus, the district court held that the plaintiff did not identify its trade secret information with sufficient particularity to support injunctive relief.  *Id*. 1252.  Here, in contrast, Plaintiffs' Trade Secret Information is specifically defined and limited to the nine Videos at issue (and content disclosed therein), all of which were confidentially maintained and all of which were misappropriated and disclosed by the Defendants.

digital files with password encryption, and limiting exposure of the Videos to distinct members of the Association and Heralds.  Lacayo Decl. at ¶¶3-7.

Plaintiffs' Trade Secret Information also derives an independent economic value that is not readily ascertainable by a third party through proper means.  Plaintiffs have invested a significant amount of time and financial resources towards compiling and developing the information that was gathered, in part, through the Committee Meetings, and administered through the Private Rituals.  Guerra Decl at ¶ 5; *see VAS Aero Svs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1359 (S.D. Fla. 2012) (ability to undercut trade secret owner's investment of resources into development of trade secret conferred an independent economic value).  Varela's attempts to personally profit from the disclosure of the Videos further demonstrates that the information contained therein derives independent economic value.  Perez Decl. at ¶¶8 & 10.  Also, the Plaintiffs' use of its Trade Secret Information to help improve the efficiency of the services provided to the Church and its parishioners further demonstrates the independent economic value derived therefrom.  Guerra Decl. at ¶6.

The evidence before this Court further demonstrates that the Defendants misappropriated Plaintiffs' Trade Secret Information by improper means.  By his own admission, Varela has stated that he obtained the Videos from members of the Association (*i.e.*, the DOE Defendants). Perez Decl. at ¶3.  The DOE Defendants were undisputedly under an obligation to maintain the confidentially of the Videos, and certainly had no authorization to disseminate the Videos to any third parties outside of the Association, let alone an individual that was known to harbor a deep resentment towards the Association and its members.  Lacayo Decl. ¶¶11 & 12.  Defendants' actions therefore constitute trade secret misappropriation under the DTSA and FUTSA, and Plaintiffs are likely to succeed on the merits of its trade secret misappropriation claims.

### C.        Plaintiffs Will Suffer Irreparable Harm Without An Injunction

"The second factor the court must consider when evaluating a request for a preliminary injunction is whether there has been a showing of irreparable harm.  This factor is 'the *sine qua non* of injunctive relief.'"  *Fortline, Inc. v. Moody*, 12-CV-81271, 2013 WL 12101142, at *5 (S.D. Fla. Jan. 7, 2013) quoting *Northeastern Florida Chapter v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir. 1990).  "In order for an injury to be irreparable, it cannot be undone through monetary remedies." *Id*.

The impact that the Defendants' actions are having on Plaintiffs' relationships is significant.  As a direct result of Defendants' infringement and misappropriation of Plaintiffs' confidentially maintained Videos and Trade Secret Information, the Vatican is presently investigating the Plaintiffs' methodologies and practices as they relate to the Private Rituals and Committee Meetings.  Guerra Decl. at ¶14; Lacayo Decl. at ¶13.  Defendants' dissemination of the Videos and Plaintiffs' Trade Secret Information is also causing incalculable damage to the Plaintiffs' reputation amongst the community, including thousands of current and potential charitable donors.  Guerra Decl. at ¶14.

Because the foregoing injury to Plaintiffs "cannot be determined with a sufficient degree of certainty," Plaintiffs have demonstrated that they are likely to suffer irreparable harm if this Court does not grant their request for injunctive relief.  *See Fortline, Inc.*, 2013 WL 12101142, at *5.

### D.        Balance Of Hardships: The Injury To Plaintiffs Outweighs Any Damage To Defendants

Third, this Court must consider whether the injury to Defendants outweighs the harm a preliminary injunction may cause to Plaintiffs.  *Id*.

Plaintiffs have invested significant resources into the compilation and development of the Private Rituals that are disclosed by the Videos at issue, and have taken reasonable measures to safeguard the confidentiality of this information.  Guerra Decl. at ¶5; Lacayo Decl. at ¶¶3-7.  As set forth above, the unauthorized disclosure of these Videos is causing irreparable injury to Plaintiffs' relationships with the Vatican, charitable donors, and parishioners.

By contrast, Defendants will suffer only minimal harm because Plaintiffs seek only to enjoin Defendants from engaging in infringing activity.  *See Suzuki Motor Corp. v. Jiujiang Hison Motor Boat Mfg. Co., Ltd.*, No. 1:12-cv-20626, 2012 WL 640700, at *5 (S.D. Fla. Feb. 27, 2012) ("[Defendant] will suffer no hardship in the event a preliminary injunction is issued, because [Defendant] has no right to engage in infringing activities.").  Compliance with the injunctive relief would only require Defendants to refrain from posting or disseminating (and return or destroy) the Videos at issue as well as any other confidential videos that may have been illicitly acquired by the Defendants.  Plaintiffs are not asking the Court to enjoin the Defendants from engaging in lawful conduct, including but not limiting to the exercise of Defendants' First Amendment rights.  Thus, the balance of hardships tips sharply in Plaintiffs' favor.

### E.    A Preliminary Injunction Will Serve The Public Interest

"Finally, this Court must address whether an injunction, if issued, will disserve the public interest. Florida law recognizes that protecting trade secrets furthers the public interest." *Fortline, Inc.*, 2013 WL 12101142, at *5, citing Fla. Stat. § 688.001; *East v. Aqua Gaming, Inc.*, 805 So. 2d 932, 934 (Fla. 2d DCA 2001) ("Finally, as to the fourth prong, it is apparent that an injunction prohibiting a former employee from using trade secrets to solicit existing customers clearly does not disserve the public interest of protecting legitimate business interests."). "The public interest can only be served by upholding copyright protection and preventing the

misappropriation of protected works." *C.B. Fleet Co., Inc.,* 510 F. Supp. 2d 1078, 1084, citing *Stoneworks Inc. v. Empire Marble and Granite Inc.,* 49 U.S.P.Q.2d 1760, 1765–66 (S.D. Fla. 1998).

Plaintiffs are seeking an injunction that recognizes and protects its Trade Secret Information as well as upholds the protection of its copyrighted Videos.  Thus, entry of a preliminary injunction will serve the public interest in this matter.

### F.      The Equitable Relief Sought Is Appropriate, Including Temporary Seizure Of Varela's Hard Drive

Because Varela is disseminating Plaintiffs' confidential Videos through his website and through third-party video hosting sites, it is likely that Varela has digitally stored the Videos in a personal laptop or similar hard drive.  Because of the format of this information, Varela can transport, hide, disseminate, or destroy this electronically stored information with extreme ease and flexibility.

Without the entry of an *ex parte* order of injunction, Varela would likely transfer and/or destroy the digital files in his possession to a more discrete location outside of his personal hard drive, or accelerate the propagation of the Plaintiffs' Videos and Trade Secret Information. Indeed, Varela has admitted that he is in possession of the "original" videos; Varela has recently admitted on his blog that he is possession of fifty (50) additional videos relating to the Plaintiffs that he plans on releasing when he purportedly raises the additional funding needed to increase the capacity of his website; and Varela is admittedly seeking the assistance of third parties to effectuate a transfer of the Videos.  Varela's admitted behavior is precisely the type of conduct that the *ex parte* provisions of Fed. R. Civ. P. 65 was historically intended to prevent.  *See Granny Goose Funds, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 439 (1974) ("Ex parte temporary restraining orders are no doubt

necessary in certain circumstances, [internal citations omitted], but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.").

With notice of an attempt by Plaintiffs to safeguard the copyrighted Videos and Trade Secret Information that are likely residing on Varela's personal laptop or hard drive, Varela can also attempt to destroy and scrub any digital trail regarding his infringing activities and misappropriation of Plaintiffs' intellectual property. These are enormous and undeniable risks that only an *ex parte* proceeding can effectively remedy. Accordingly, in addition to entering the attached proposed order of injunction, Plaintiffs also request an order instructing Varelo to turn in his personal laptop or other personal hard drive to the U.S. Marshall's Service immediately, for the limited purpose of permitting Plaintiffs to take an image of the hard drive. Varelo's laptop or hard drive shall be returned to Varelo immediately following completion of the image of the hard drive.

### G.    A Minimal Bond Should Secure the Injunction

Because of the strong and indisputable nature of Plaintiffs' evidence of Defendants' illicit conduct, Plaintiffs respectfully requests this Court require them to post a bond of no more than one thousand dollars ($1,000.00). The posting of security upon issuance of a temporary or permanent injunction is vested in the Court's sound discretion. Fed. R. Civ. P. 65(c).

### IV.    CONCLUSION

Defendants are infringing and misappropriating Plaintiffs' copyrighted Videos and Trade Secret Information for their own financial gain, and to the irreparable detriment of Plaintiffs' reputation and relationships. There is a high likelihood that Plaintiffs will succeed on the merits of their claims against Defendants. Thus, Plaintiffs respectfully request that the Court issue a

temporary restraining order, followed by a preliminary injunction, ordering Defendant to cease and desist from infringing Plaintiffs' copyrights and misappropriating Plaintiffs' Trade Secret Information.

Dated: June 20, 2017                    Respectfully submitted,

                                        /s/ *Richard Guerra*
                                        Richard Guerra (Fla. Bar No. 689521)
                                        Email: rguerra@mcdonaldhopkins.com
                                        Rafael Perez-Pineiro (Fla. Bar No. 543101)
                                        Email: rperez@mcdonaldhopkins.com
                                        MCDONALD HOPKINS LLC
                                        Southeast Financial Center, Suite 2600
                                        200 South Biscayne Boulevard
                                        Miami, Florida 33131
                                        Telephone: (305) 704-3990
                                        Facsimile: (305) 704-3999

                                        MICHAEL C. CESARANO, P.A.
                                        Michael C. Cesarano (Fla. Bar No. 297216)
                                        Email: mccesarano@yahoo.com
                                        2665 South Bayshore Drive, Suite 220
                                        Coconut Grove, FL 33133
                                        Telephone No. (305) 778-5155

                                        *Counsel for Plaintiffs*

## CERTIFICATE PURSUANT TO FED. R. CIV. P. 65

I HEREBY CERTIFY that, pursuant to Fed. R. Civ. P. 65(b)(1)(B) and in view of the facts set forth above, the relief requested herein should be granted without requiring notice to Defendant Varela.  Nevertheless, Plaintiffs have initiated efforts to personally serve Varela in accordance with Fed. R. Civ. P. 4 with copies of the Complaint, this Motion, and all accompanying declarations and exhibits in support thereof.

                                        /s/ *Richard Guerra*
                                        Richard Guerra